```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

LOUIS CRAIN                                       CIVIL ACTION

VERSUS                                            NUMBER: 06-1618

N. BURL CAIN, WARDEN                              SECTION: "F"(5)
```

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Louis Crain, the State's response thereto, and petitioner's traverse to the State's response. (Rec. docs. 1, 5-7). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Crain's petition be dismissed with prejudice.

Petitioner Crain is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On January 9, 2002, Crain was found guilty of

aggravated rape after trial, by jury, in the Twenty-Second Judicial District Court for the Parish of St. Tammany, State of Louisiana. On February 4, 2002, Crain was sentenced to life in prison without benefit of parole, probation, or suspension of sentence.

Crain directly appealed his conviction to the Louisiana First Circuit Court of Appeal, arguing that the jury's finding of guilt was not supported by sufficient evidence. On December 20, 2002, the Louisiana First Circuit affirmed Crain's conviction and sentence in an unpublished opinion. State v. Crain, 837 So.2d 764 (La. App. 1st Cir. 2002)(table). Writs were denied by the Louisiana Supreme Court on October 10, 2003. State v. Crain, 855 So.2d 327 (La. 2003). Crain's conviction became final ninety days later when the delays for seeking a writ of certiorari from the U.S. Supreme Court expired and no application therefor was made. See Louisiana Supreme Court Rule X, §5(a); Williams v. Cain, 217 F.3d 303, 308 (5th Cir. 2000).

Thereafter, on July 8, 2004, petitioner filed an application for post-conviction relief in the state trial court in which he argued that said court had failed to give a limiting instruction on other crimes evidence, that counsel was ineffective for not objecting to that failure, that the trial court failed to provide written notification of the sex offender registration requirements, that the State failed to prove the essential elements of the crime

in question, and that counsel was ineffective for failing to file a motion for new trial to challenge the State's alleged failure of proof. (St. ct. rec., vol. 5 of 5). On July 27, 2004, the trial judge issued an order requiring Crain to appear in court to receive notification of the sex offender registration requirements but denying petitioner's application for post-conviction relief in all other respects. (Id.). From that ruling, Crain took writs to the Louisiana First Circuit which were denied on December 1, 2004. State ex rel Crain v. Cain, No. 2004-KW-1901 (La. App. 1st Cir. Dec. 1, 2004)(unpublished opinion). Crain's subsequent writ application to the Louisiana Supreme Court met a similar fate. State ex rel. Crain v. State, 916 So.2d 1041 (La. 2005). Crain signed his federal habeas petition on January 17, 2006. (Rec. doc. 1, p. 6). The State concedes that Crain has exhausted available state court remedies as required by 28 U.S.C. §2254(b)(1)(A) and that his petition was timely-filed under 28 U.S.C. §2244(d).

In the instant petition under §2254, Crain presents five claims for relief which he frames as follows:

1.  [d]id the trial court err in accepting the guilty verdict against the defendant when the victim was the only eyewitness to the incident and there was no physical evidence to corroborate the victim's allegation of rape?

2.  [d]id the trial court failed [sic] to give limiting jury instruction on other crimes evidence?

3.  [w]as petitioner denied effective assistance of counsel

>    when his attorney failed to object to the trial court's failure to give a limiting jury instruction on other crimes evidence?
>
> 4. [d]id the state failed [sic] to prove essential elements of [the] crime during trial on the merits?
>
> 5. [w]as trial counsel ineffective in his actions for failing to object to and file motions on the states failure to prove every essential elements [sic] of the crime?
>
> (Rec. doc. 1, p. 17).

Before proceeding further, some clarification is in order to identify the claims that are properly before the Court. Although Crain listed the five claims noted above as those which he wished to be adjudicated in this proceeding, he briefed only the first three of those claims in his supporting memorandum. (Rec. doc. 1, pp. 17 et seq.). In its opposition to Crain's petition, the State nevertheless responded to all five of Crain's claims, addressing the first and fourth ones together under a sufficiency-of-evidence analysis and addressing the third and fifth claims in tandem under an ineffective-assistance-of-counsel analysis. (Rec. doc. 5, pp. 3-8). Crain subsequently filed a traverse to the State's opposition in which he abandoned his second and third claims regarding the trial court's failure to give a limiting instruction on other crimes evidence and ineffective assistance of counsel for not objecting to that failure. (Rec. doc. 7, p. 5). Crain's traverse also serves to change the scope of the Court's focus in

4

two other important respects. While the sufficiency-of-evidence claim briefed by Crain in his original supporting memorandum tracked only the argument which he had urged in his direct criminal appeal (i.e., the conviction was based on the victim's testimony alone with no corroborative physical evidence), he now specifically requests that the Court consider the variation of that claim that he litigated in his application for post-conviction relief (i.e., that the State failed to prove that the victim's I.Q. was below 70) as well as the related claim that counsel was ineffective for failing to challenge the alleged shortcoming of proof in that regard. (<u>Id</u>. at pp. 2-5).[1]/ That leaves before the Court for adjudication here the claims set forth above numbered as one, four, and five.

In order to facilitate a resolution of Crain's claims, the Court will recall the evidence presented at his trial as aptly summarized by the Louisiana First Circuit in the context of his direct criminal appeal, as follows:

> [t]he victim's November 20, 2000 videotaped statement concerning the offense was introduced into evidence at trial without any

---

[1]/ In his traverse, Crain faults the State for not addressing his I.Q.-related sufficiency-of-evidence claim in its opposition. (Rec. doc. 7, p. 6). To the extent that the State failed to do so is entirely understandable given the fact Crain did not brief that variation of his insufficiency claim in his original supporting memorandum.

objection by the defense. The victim, T.C., did not know when the offense occurred, but knew it occurred after dark and when she was out of school. She stated that her father drank beer everyday and had been drinking on the day of the instant offense. During the interview, the victim was shown a sketch of a naked girl and a sketch of a naked boy and asked to identify the various body parts on the sketches. She identified the girl's "private part" in the groin area, the boy's penis, which she referred to as his "ding-a-ling," and the girl's and boy's buttocks, which she referred to as their "butt".

When asked about what happened with her father, the victim described how after "Aunt Ida Mae" was asleep, she (the victim) was sitting on the living room couch with her dad watching a movie. The victim's father told the victim to "come here" to "talk about sex." Her father told her the Bible says fathers "tells you about sex; like shows you how to do it actually; shows you how to do it." The victim's father asked the victim if she wanted him to "show her," and the victim stated, "no." The victim's father then unbuttoned her pants and put his hand down the victim's pants. In response to the questioning by the interviewer, the victim indicated her father had touched her inside of her pants and underwear. She stated her father had touched her "private part," "rubbed it all over," and "put his finger in there." The victim indicated she told her father to stop, but he did not. Thereafter, he told the victim they would be more comfortable if they went into his bedroom. He then picked the victim up, took her to his room, turned off the lights, and shut the door. He told the victim to take her clothes off and then went into the living room. He returned shortly thereafter, but the victim had not undressed. The victim's father struck her in the head with his hand and again told her to undress. She then took her

6

clothes off, and he "started doing sex."

The victim described her father's bed as having sheets, a blue cover with designs on it, and a blanket on top that was made out of yarn and had brown and different colors on it. She stated that her father had put a white towel down on the bed under her. She indicated she was lying on her stomach, and her father, who was also undressed, got on top of her and put his "thing" in her. In response to questioning, the victim indicated that she was referring to her father's "ding-a-ling." The victim indicated her father had put his "ding-a-ling" in her "hole" "where poo-poo comes out." He then told her to turn around, and he put his "ding-a-ling" in her "private part." The victim described how "white stuff" came out of her father's "ding-a-ling" and went in her. The victim's father then told the victim she was tense and that he was going to put "it in [her] mouth to make her not so tense." The victim indicated "like white stuff" came out of her father's "ding-a-ling" when he put it in her mouth.

When asked if this had happened on any other occasions, the victim stated that her father had told her he would "do it" three times then quit. However, he was only able to "do it" once because he was incarcerated shortly after the first time. The interviewer also asked the victim if she had told anyone else about what happened. The victim indicated that she told her cousin, who advised her to tell one of her teachers. The victim then told "Ms. Judy" about it, and "Ms. Judy" said she would help the victim. By the end of the interview, the victim was in tears.

The victim also testified at trial. She stated her name, age, and where she went to school. She answered questions indicating she knew the difference between the truth and a lie. She indicated the offense occurred when

7

she lived in a trailer with Aunt Ida Mae. She described her father telling her to sit by him and telling her, "that's what fathers do, is do sex[,]" "that's what's in the Bible." Her father then picked her up "[l]ike a baby[,]" took her to his bedroom, put her down, told her to take her clothes off, and went in the living room. When the victim's father returned and the victim was still clothed, he hit the victim in the head, and she undressed. The victim's father, who was also undressed, then got on top of the victim on the bed and put his "[d]ing-a-ling" into her "private part in front[.]" The victim indicated her father also put his "ding-a-ling" in her butt and in her mouth, stating she was "too tense." She added that when her father put his ding-a-ling in her mouth, "[w]hite stuff came out."

Verena Mae Bennett, one of the victim's relatives, also testified at trial. Bennett indicated that while the victim's father was in jail, she would call over to the victim's home to see how things were going. The victim told Bennett the victim's father was "messing" or "fooling" with her. Bennett advised the victim that no one was supposed to "fool" with her and that she should tell someone about what had occurred.

St. Tammany Parish Public Schools Coordinator of Pupil Appraisal Nancy Hamilton also testified at trial. In January 1996, the victim's ability to learn had been tested using the Wechsler Intelligence Scale. At that time, the victim's verbal score was poorer than the scores of ninety-nine out of one hundred children taking the test.

Susie Houk, a teacher at Mandeville Junior High, also testified at trial. She taught students who were mildly mentally disabled and some who were moderately mentally disabled. The victim had been one of Houk's students since August 2000.

Around Thanksgiving 2000, Houk noticed a change in the victim's behavior. The victim had been "real outgoing," but then started being very quiet and not as patient with her fellow students. When asked if she had ever talked to the victim about telephone conversations that she (the victim) had with her father while he was in jail, Houk indicated that the victim once told her that she had hung up on her father because she "was mad at him."

Health and [S]afety [I]ntervention [S]pecial [E]ducation [A]ssistant Judith Laborde Canzoneri also testified at trial. Shortly before the Thanksgiving holiday of 2000, Canzoneri was approached by a woman identifying herself as one of the victim's relatives. After talking to the relative, she became concerned about the victim and wanted to talk to her about what the relative had told her. Later that evening, Canzoneri asked the victim to take a ride with her. On the ride, the victim told Canzoneri one of the victim's relatives wanted to "call" her to talk to her about the victim. Canzoneri told the victim that she (Canzoneri) did not know the relative and asked the victim if there was anything she wanted to tell Canzoneri. The victim then disclosed something that Canzoneri thought was serious enough that Child Protection should be notified.

Dr. Scott Benton, Medical Director at Children's Hospital of New Orleans, also testified at trial. Dr. Benton supervised and reviewed the results of a physical examination of the victim in the fall of 2000. The victim was a healthy, normal fifteen-year-old female. Dr. Benton noted that the areas generally examined in a child who complains of sexual abuse were within normal limits on the victim. Further, no injuries to the victim's hymen were detected.

> Dr. Benton explained that the results of the victim's examination could mean one of three things. The first possibility was that nothing ever happened to her. The second possibility was that something happened, but it did not cause injury. The third possibility was that injury was caused, but the injury had sufficient time to heal. Dr. Benton indicated average injuries to the hymen would completely heal in two to three weeks.
>
> Dr. Albert Tydings, a board certified OB/GYN, was called as a witness by the defense. He indicated that he would expect injury to the hymen of a fifteen year-old having sex for the first time.
>
> The defendant also testified at trial. He conceded the victim was one of his children, but denied raping her or touching her in her pants.
>
> Crain, No. 2002-KA-1198 (unpublished opinion at pp. 2-5)(footnote omitted).

Crain's first and fourth claims herein challenge the sufficiency of the evidence used to convict him. Related as they are, the claims will be addressed together.

The appropriate standard of review of claim of insufficiency of evidence is "... whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The Fifth Circuit has held that in making

determinations on the sufficiency of the evidence, the Court should not substitute its view of the evidence for that of the fact finder, but should consider all of the evidence in the light most favorable to the prosecution.  <u>Whitmore v. Maggio</u>, 742 F.2d 230, 231-32, (5th Cir. 1984).  The assessment of whether the commission of a crime is adequately supported by the record necessarily entails reference to the substantive elements of the criminal offense as defined by state law.  <u>Alexander v. McCotter</u>, 775 F.2d 595, 597-98 (5th Cir. 1985); <u>Turner v. McKaskle</u>, 775 F.2d 999, 1001 (5th Cir. 1983).

At the time of the offense in question, Louisiana law defined rape as "... the act of anal or vaginal sexual intercourse with a ... female person committed without the person's lawful consent."  LSA-RS.. 14:41(A).  Louisiana law further defined aggravated rape as "... a rape committed ... where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act because the victim suffers from a ... mental infirmity preventing such resistance."  LSA-R.S. 14:42(A)(6). The term "mental infirmity" as used in R.S. 14:42 "... means a person with an intelligence quotient of seventy or lower."  LSA-R.S. 14:42(C)(2).

In the memorandum supporting his petition, Crain argued that

the evidence presented by the State was insufficient to support a conviction because it was largely based on the victim's testimony alone with no corroborative physical evidence. This contention is easily disposed of. In Louisiana, sexual offenses can be proved up based on the victim's testimony alone without corroborative medical, scientific, or physical evidence. State v. Singleton, 922 So.2d 647, 650 (La. App. 5th Cir. 2006); State v. Johnson, 764 So.2d 1113, 1118-19 (La. App. 4th Cir.), writ denied, 794 So.2d 822 (La. 2001); State v. Hubbard, 708 So.2d 1099, 1103-04 (La. App. 5th Cir.), writ denied, 723 So.2d 415 (La. 1998)(citing State v. Rivas, 407 So.2d 1195 (La. 1981)); State v. Ingram, 688 So. 2d 657, 664 (La. App. 2nd Cir.), writ denied, 700 So.2d 505 (La. 1997); State v. Williams, 632 So.2d 351, 357 (La. App. 1st Cir. 1993), writ denied, 643 So.2d 139 (La. 1994). The victim's trial testimony that Crain had sexually assaulted her was thus sufficient, by itself, to sustain his conviction. (St. ct. rec., vol. 3 of 5, pp. 575-577).

In the second variation of his insufficiency-of-evidence claim, Crain challenges the adequacy of the State's proof regarding the victim's I.Q. The following information bearing on that issue can be gleaned from the state court record.

In the written summary which he prepared following his investigation into the crime in question, Det./Sgt. Grant Ross of

12

the St. Tammany Sheriff's Office noted that the victim had been diagnosed as having a mild to moderate learning deficit, "... with an I.Q. of 51, and an age equivalent of seven (7) years, two (2) months." (St. ct. rec., vol. 1 of 5, p. 89). During a pre-trial motion hearing held on January 7, 2002, the trial judge questioned the victim, who was an eighth grade special education student at the time, at length on her competency to testify and her ability to tell the truth. Following that testimony, defense counsel asked the trial judge to review the victim's school records from Alabama and St. Tammany Parish which had previously been provided by the prosecutor. After doing so, the trial judge found that the victim was competent to testify "even though she is obviously performing because of mild retardation at a low level in school" at roughly the first grade level in reading and math. (St. ct. rec., vol. 1 of 5, pp. 217-227). Among the numerous motions that the trial judge subsequently denied was the defense's motion for the appointment of a psychologist, presumably for the purpose of performing more current I.Q. testing of the victim. (Id. at p. 227).

The first witness called by the State at trial was Nancy Hamilton, a psychologist who supervised placement officials within the St. Tammany Parish School System. After explaining the purpose of WISC-III tests, Hamilton testified to the results of two sets of such tests administered by Alabama school officials when the victim

was 7.75 years old and by St. Tammany Parish school officials when the victim was 10.5 years old.  In the former set of tests, which were done while the victim was still in her mother's custody, the victim achieved a verbal I.Q. score of 69, a performance I.Q. score of 68, and a full-scale I.Q. score of 67.  In the latter set of tests, the victim obtained a verbal I.Q. score of 52, a performance I.Q. score of 62, and a full-scale I.Q. score of 53 which, Hamilton indicated, was a relatively good indication of the victim's capabilities.

Subsequent to the second set of WISC-III tests, St. Tammany Parish school officials had also evaluated the victim under the Vineland Adaptive Behavior Scale, a measure of the victim's application of learned skills to everyday living.  The results of that evaluation revealed that the victim was significantly limited when compared to other children, obtaining a communication score of 49, a daily living skills score of 59, a socialization skills score of 59, and an overall score of 51, meaning that she was performing only as well as one out of one hundred children of her age.  Comparing the victim's Vineland scores with those obtained upon the earlier WISC-III testing, Hamilton testified that the victim's performance had significantly declined.  On cross-examination, Hamilton admitted that she did not personally administer the victim's psychological testing, that the WISC-III testing that was

14

conducted in St. Tammany Parish was only partially given, and that no further testing had been undertaken since that time. (St. ct. rec., vol. 3 of 5, pp. 516-527). The State's second witness Susie Houk, testified that the victim, who was sixteen years of age at the time, was reading at a first to second degree level. (Id. at pp. 528-529).

Viewing the above-described evidence in the light most favorable to the prosecution, as it must, the Court believes that the I.Q. element of the aggravated rape statute was sufficiently proved up by the State. The state courts' similar assessment of the evidence is entitled to great weight here, Poretto v. Stalder, 834 F.2d 461, 467 (5th Cir. 1987), and is far from being so unreasonable so as to justify federal habeas relief. 28 U.S.C. §2254(d); Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000); Montoya v. Johnson, 226 F.3d 403-04 (5th Cir. 2000), cert. denied, 532 U.S. 1067, 121 S.Ct. 2220 (2001).

Crain's final claim is that he was denied the effective assistance of counsel based on the fact that counsel "... made absolutely no effort on the record to hold the State accountable and prove th[e] ... [I.Q.] element of the crime ...". (Rec. doc. 7, p. 5).

To merit relief on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test

articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 104 S.Ct. 2052, 2064 (1984), by demonstrating that (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  The burden of proving either element of Strickland is a heavy one and if proof of one element is lacking, the Court need not consider the other.  Id. at 697, 104 S.Ct. at 2069.  Strickland, review is highly deferential and a petitioner must overcome the strong presumption that counsel's action or inaction was part of a sound trial strategy.  Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981).  The prejudicial element of Strickland requires a petitioner to show that, but for his attorney's errors, there is a reasonable probability that the result of the trial would have been different, a probability sufficient to undermine confidence in the outcome of the proceeding.  Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.  Moreover, "[i]f the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail."  Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir.), cert. denied, 493 U.S. 831, 110 S.Ct. 102 (1989).

Because the Court believes that the State adequately established the victim's I.Q. as required by the aggravated rape

statute, counsel was not ineffective for failing to file meritless motions to challenge that alleged inadequacy of proof. That having been said, a review of the record readily reveals that counsel did an admirable job in presenting the defense that he did. Prior to trial, defense counsel brought on a flurry of pre-trial motions, including a motion for a hearing at which the victim would be examined to determine her competency to testify and an unsuccessful motion for the appointment of a psychologist to perform psychological testing. At trial, defense counsel did an exemplary job in challenging the victim's recollection of the incident, the thoroughness of the officials' investigation, and the motivation and interests of the victim and other prosecution witnesses in testifying the way that they did. The Court is hardly in a position to second-guess the jury's obvious credibility determinations. See, e.g., Marler v. Blackburn, 777 F.2d 1007, 1011-12 (5th Cir. 1985); Armstead v. Maggio, 720 F.2d 894, 896-97 (5th Cir. 1983); Dunn v. Maggio, 712 F.2d 998, 1001 (5th Cir. 1983); cert. denied, 465 U.S. 1031, 104 S.Ct. 1297 (1984). Other than sheer speculation, Crain points to no evidence bearing on the victim's I.Q. which, had it been presented by defense counsel, would have changed the outcome of the trial. Neither deficient performance nor prejudice are shown here.

17

**RECOMMENDATION**

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Louis Crain be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  6th  day of _____July_____, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

18